UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-256 (JMB/EMB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | **GOVERNMENT'S TRIAL BRIEF** |
| Plaintiff, | ) ) | |
| | ) ) | |
| AMIIR MAWLID ALI, | ) ) | |
| Defendant. | ) ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its trial brief. Trial is scheduled to begin on April 13, 2025. The Defendant is indicted on one count of possession of a machinegun, in violation of 18 U.S.C. §§ 922(o)(1) arising from the defendant's possession of a loaded Glock model 29gen5 10mm semi-automatic pistol equipped with an attached machinegun conversion device on or about June 3, 2025. The United States anticipates that its case in chief will take three days.

## BACKGROUND

On June 3, 2025, Minneapolis Police Department (MPD) Officers Mohamud Jama and Matthew Olson executed a traffic stop on a silver sedan due to multiple traffic violations. The traffic stop was captured on the officers' body-worn cameras. Officer Jama's bodycam shows that upon approaching the driver, Officers Jama and Olson asked that the windows be rolled down, as they could not see the interior of the vehicle—including its occupants—through the extreme window tint.

1

The car had three occupants, and the Defendant was in the front passenger seat. Officer Jama asked the occupants if they had any weapons in the vehicle. The occupants hesitated, then said "No."  Officer Jama immediately asked: "Why'd you guys hesitate?" Officer Olson simultaneously said, "Pretty slow to respond…" The officers found this suspicious indicating the possible presence of an illegal firearm, especially when no occupant indicated they had a permit to carry. Throughout the stop, the Defendant was looking down at the floorboard in front of him and his feet kept moving a pair of shoes that were lying on the front passenger floorboard which the officers found suspicious.

Officer Jama recognized the Defendant as a member of the "Muddy" street gang which he had been investigating and was aware of his history of suspected involvement in weapons offenses.[1] As officers waited for the car occupants' IDs, the occupants indicated that they were late for graduation. Officer Jama testified that this also raised his suspicions during the stop, as he was aware of the Wayzata graduation shooting and the Muddy gang's involvement. Based on the suspicious response to his question about weapons, the Defendant's suspicious movements and averted gaze throughout the stop, and Officer Jama's knowledge of both the Defendant's and the Muddy gang's history with firearms, Officer Jama decided to have the occupants step out of the vehicle for a weapons sweep for officer safety.

Officer Jama asked the driver to step out of the vehicle; the driver complied and

---

[1] The United States does not plan to introduce evidence of the Defendant's gang involvement at trial. It is noted herein for context on the traffic stop.

2

accompanied Jama to the squad vehicle without incident.  Officer Jama then removed the Defendant from the front passenger seat and took him to the same squad vehicle, telling him he was not under arrest and if everything went smoothly, it would be fine. As Officer Jama reached for the squad vehicle door, the Defendant attempted to flee.  At that point, Officer Jama placed him under arrest for attempting to flee on foot.

Officer Jama then returned to the stopped vehicle and, after the third and final occupant was removed, performed a weapons sweep of the passenger compartment. In a few seconds, he located a firearm with a machinegun conversion device ("MCD") and a large extended magazine underneath the passenger seat where the Defendant was shuffling his feet and staring. The firearm was stuck under the seat, consistent with someone pushing it under the seat with their feet.

The Defendant was initially released following his arrest for this offense. On June 5, 2025, the United States filed a complaint alleging possession of a machinegun in violation of 18 U.S.C. 922(o) and this Court issued a warrant for the Defendant's arrest. The Defendant was arrested on the federal warrant three days later while at the Burnsville High School graduation where shots had been fired in another suspected gang-related incident.  The grand jury subsequently indicted the Defendant on one count of possession of a machinegun in violation of 18 U.S.C 922(o).

MPD swabbed the firearm found under the Defendant's seat for DNA and the Minnesota Bureau of Criminal Apprehension performed DNA analysis of these swabs. MPD received a warrant for the Defendant's DNA. From the mixture of DNA, the BCA was able to identify a major male profile that matches to the Defendant's known profile.

3

Both the MPD crime lab and an expert at the Bureau of Alcohol, Tobacco, Firearms, and Explosives examined and test-fired the firearm with the MCD attached and found that it operated as machinegun—meaning, it allowed the firearm to fire multiple rounds of ammunition with a single pull of the trigger.

In June, while the Defendant was in jail, he made two calls relevant to the issues at trial. On the first call, from the Hennepin County Jail, he informed the others on the call that he needed a lawyer for a "button case" and in the second call, from the Dakota County Jail, he informed the other person that he was in jail for a "switch". The words "switch" and "button" are common terms for an MCD.

### EXPECTED EVIDENCE

The United States intends to call MPD Officers Olson and Jama to testify about the traffic stop, the Defendant's arrest and attempt to flee, finding and logging the machinegun into evidence, and the process for swabbing the machinegun for DNA. The United States intends on using a demonstrative map during the testimony to help orient the jury to the events leading up to the traffic stop. The United States will introduce through the officers' testimony, bodycam and squad car footage clips that capture the traffic stop, arrest, attempted flight, and the officers finding the firearm. The United States does not intend to illicit testimony regarding the Defendant's suspected gang involvement. The United States will also offer the actual machinegun including the extended magazine, bullets, and MCD through one of the two MPD officers as well as the DNA swab and photos of the machinegun.

4

The United States intends to call Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Nicholas McAdams to testify about the transfer of the machinegun from MPD to ATF custody for testing. The United States anticipates introducing the Defendant's jail calls through Special Agent Adams as well. The jail calls are self-authenticating and admissible pursuant to Fed. R. Evid. 803(6), 902(11), and 902(14). *See* Government's Fifth Motion in Limine, ECF No. 75 & 79. The United States has provided defense counsel with certifications signed by the records custodian of each record.

The United States anticipates calling two experts—forensic scientist Alexander Bjostad who will testify regarding the DNA; and Firearms Technician Andrew Griffith who will testify about testing the machinegun. The United States will also offer into evidence a video of the test fire that Mr. Griffith conducted on the machinegun.

## LEGAL ISSUES

### I.   The United States' Motions *in Limine* Should be Granted

The United States incorporates its motions in limine and corresponding consolidated brief herein. ECF No. 71-79. The United States respectfully asks this court for an order: (1) precluding the Defendant from relitigating discovery and pre-trial suppression issues; (2) precluding the Defendant from introducing evidence or argument related to collateral consequences or punishment should the Defendant be convicted; (3) precluding the Defendant from admitting his own self-serving hearsay statements; (4) precluding evidence or argument related to Defendant's personal and family history,

religion, lack of criminal history, prior commission of "good acts," or non-commission of other "bad acts"; (5) ruling that jail calls are admissible as self-authenticating domestic records of regularly conducted activity; (6) precluding argument or evidence regarding the Government's charging decisions; (7) precluding references to federal or local law enforcement controversy or civil unrest; (8) and  permitting the United States to have the case agent, FBI Special Agent Thomas Chorlton,  sit at counsel table. *See Id.*

## II.    Body-Worn-Camera and Squad Car Footage Clips are Admissible

The United States will offer into evidence certain bodycam and squad-car video clips from arresting officers Olson and Jama. The videos show the following:

- The outward view from the front of the squad car that captures the traffic violation and the short pursuit before the suspect vehicle pulls over;

- Officer Jama getting out of the squad car, approaching the suspect vehicle, and asking the occupants for their name, identification, and if there are firearms in the car. The video also captures the occupants' responses;

- The officers asking the Defendant to identify himself and the Defendant's response;

- The officers giving the occupants of the car instructions on being pulled out of the car, patted down, and placed in the squad car while the officers search the suspect vehicle;

- Bodycam footage of the officers providing instructions to and removing the occupants from the vehicle. The footage of the Defendant being removed

6

shows the Defendant attempting to flee, Officer Jama asking the Defendant why he attempted to flee, and the Defendant's response.

- Clips of Officer Jama, noticing the firearm, realizing that it has a MCD attached, taking pictures of where the gun was placed in the car, pulling the gun out of the car, alerting officers to the presence of the gun, and putting the gun in an evidence box while speaking to officers on scene about what was happening.

The footage includes the following types of statements: (1) contemporaneous officer observations on what was occurring at the scene and limited officer communications about executing the traffic stop; (2) officers' questions, commands, and instructions to the occupants of the car including the Defendant; and (3) responses to the officers' questions. We address each in turn.

First, the officers' recorded statements in the clips are admissible as present sense impressions under FRE 803(1). FRE 803(1) provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it," is not excluded by the hearsay rule. Fed. R. Evid. 803(1). Here, the officers describe or explain events such as that there was a machinegun in the car and other aspects related to the traffic stop while they are perceiving them or within moments of doing so, such that the "substantial contemporaneity of the event and statement" justifies their admissibility. *United States v. Dean*, 823 F.3d 422, 427-28 (8th Cir. 2016) (holding that recordings of a victim's 911 call and subsequent statements made in an

officer's body microphone shortly after an altercation with her father were admissible under the present sense impression exception).

Second, the questions that the officers ask the passengers, like their name, date of birth, where they are going are not hearsay as they are not statement assertions under Federal Rule of Evidence 801(a). Nor are the commands and instructions the officers give the passengers for exiting the vehicle, complying with a pat down, and remaining in the squad car while the vehicle is being searched.

Third, the answers that the passengers give to the officers' questions are not hearsay as they are not being offered for the truth of the matter asserted but instead for their impact on Officer Jama and Officer Olson's investigation during the traffic stop. The passenger's answers informed Officer Jama and Olson's judgments about how to conduct the stop including determining that the car should be searched for weapons and where weapons may have been in the car. *See generally United States v. Amahia*, 825 F.2d 177, 181 (8th Cir. 1987) (noting that under FRE 801(c), a statement not offered for the truth of the matter asserted is not hearsay). Additionally, the United States may admit any of the Defendant's statements captured on bodycam footage as party-opponent statements pursuant to Rule 801(d)(2). Accordingly, the Court the bodycam and squad car clips are admissible.

## III.    The Defendant's Motion *in Limine* Should be Denied

The Defendant has cursorily moved to the Court "for an Order prohibiting the Government from using any 'bad act' or 'similar course of conduct' at trial pursuant to

8

Rule 404" without specifying what such evidence the Court should exclude or the basis for such an exclusion in light of the permitted uses pursuant to Rule 404(b)(2). The Defendant's brief is therefore deficient and should be denied. *See* Scheduling Order, ECF No. 60 ("Each motion in limine . . . shall include the legal argument in support of the motion. . . . Failure to support a motion in limine with legal authority may result in denial of the motion."). The United States does not intend to offer such evidence but reserves the right to do so upon notice to the Defendant pursuant to Federal Rules of Evidence 404(b)(2)-(3).


Dated: March 16, 2026                    Respectfully submitted,

                                         DANIEL N. ROSEN
                                         United States Attorney

                                         /s/ *Alexandra Swain*
                                         Alexandra P. Swain
                                         Trial Attorney
                                         Violent Crimes and Racketeering
                                         Section; U.S. Department of Justice

                                         ALBANIA CONCEPCION
                                         Assistant United States Attorney
                                         United States Attorneys' Office
                                         District of Minnesota

9